636 So.2d 735 (1993)
Mark STERN, a/k/a Mark Allen, Appellant,
v.
Jackie STERN, Appellee.
No. 92-2699.
District Court of Appeal of Florida, Fourth District.
December 8, 1993.
Order Modifying Opinion on Limited Grant of Rehearing April 6, 1994.
*736 Steven D. Rowe of Law Offices of Steven D. Rowe and Nancy Little Hoffman of Nancy Little Hoffman, P.A., Fort Lauderdale, for appellant.
Domenic L. Grosso of Domenic L. Grosso, P.A., and Amy D. Shield of Amy D. Shield, P.A., Boca Raton, for appellee.
DONNER, AMY STEELE, Associate Judge.
Mark Stern, the former husband, brings this appeal from a final judgment dissolving his marriage to Jackie Stern, the former wife, and distributing their marital property. Finding error in three of the numerous points raised, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
*737 The parties were married for twelve years but never had any children. On their wedding day they executed a premarital agreement which provided, among other things:
5. That Mark S. Stern waives any right to any stock in NRC Electronics, Inc. currently belonging to Jacqueline Eisen as of this date. Same shall apply to any future subsidiaries of NRC Electronics, Inc.
6. That anything purchased by both parties or assets accumulated from this date forward shall be divided equally by both parties.
According to the former husband's trial testimony, approximately six months later, the parties executed an addendum to that agreement. The addendum provided that if they purchased a home, then: (1) each party would furnish one-half the down payment and both parties would own the home equally; (2) the former wife would be responsible for all monthly payments on the mortgage and maintenance on the home; in return, she was allowed the entire tax deduction for interest and taxes; and (3) the former husband would reimburse her for a portion of these expenditures. In the event of a divorce, the addendum further provided that, upon the sale of the home, the equity was to be divided equally between the parties, as would the contents of the home, unless owned by either party prior to the marriage. At trial, the former wife acknowledged her signature on all four original copies of the addendum, but claimed her husband had her sign them without her knowing what she was signing. In fact, she testified the first time she saw this document was at her deposition. Further, in the parties' pretrial stipulation, she disputed the validity of the addendum.
In March of 1980, the parties purchased a home in Coral Springs, where they lived until 1987. The evidence is in dispute in regard to whether the former wife made all the mortgage and maintenance payments, and whether the former husband reimbursed her for some of the household expenses as required by the addendum.
At the time of the marriage, the former wife was a 25% owner of NRC Electronics, Inc. Howard Eisen, her former husband, owned the rest of the company. By the time of trial, the former wife owned a 25% interest in several other corporations and a partnership which had grown out of the mother company (NRC)  Jaro Components, Inc.; Jaro-Dixie, Inc.; and Hojack Partnership.
On various applications for disability insurance which the former husband submitted during the marriage, he claimed a yearly salary in excess of $80,000. In 1988, the former husband's major business, Mark Allen Productions, showed a profit of $375,000, which decreased slightly to $345,000 in 1989. As of December of 1989, Mark Allen Productions had accounts receivable of $1,900,000, although the former husband claimed at trial that those accounts were probably no longer collectible. In addition, the former husband was involved in a corporation with his brother, Gary Stern, called Brothers Entertainment Group, which was eventually dissolved. At some point prior to going out of business, the company entered into a settlement with Pan American Insurance on a business interruption policy. Without revealing this settlement to his brother or his wife, the former husband received $78,000.
In November of 1987, the parties sold their Coral Springs home and, after paying off the mortgage, placed the entire $90,000 in equity into the purchase of a $375,000 condominium. The former wife added $35,000 from her earnings to cover the $125,000 down payment.
In February of 1990, the former husband alleged he was seriously injured in a slip and fall accident. The various insurance carriers with whom he had carried disability policies found him to be 100% disabled, both physically and neurologically, and began issuing benefits under the policies.
On July 31, 1991, the former wife filed a petition for dissolution seeking, inter alia, enforcement of the premarital agreement, a declaration that each party owned his or her own separate assets, a distribution of marital assets, and exclusive possession of, as well as a special equity in, the jointly-owned condominium. The former husband answered and counter-petitioned for essentially the same relief. Interestingly enough, the addendum was not attached to the former husband's *738 counter-petition, even though he was seeking exclusive possession of the condominium.
During the pendency of the dissolution proceedings, the former husband also sought temporary support based on his need and the former wife's ability to pay. According to the former husband's August 1991 financial affidavit, he was only receiving a total income of $3,281, which came from his worker's compensation and various disability payments. On his October 1991 financial affidavit, he claimed this income was reduced to $2,065. Further, in both affidavits the former husband claimed to have monthly medical expenses in the amount of $4,775, as well as car and boat expenses. And at the temporary support hearing, he maintained he was receiving only $2,065 a month and getting no other disability income. As a result, the trial court ordered the former wife to pay $2,500 per month in temporary support.
At trial, it was revealed that the former husband was actually receiving approximately $13,000 per month in worker's compensation and disability payments. In particular, the husband's worker's compensation carrier paid out a total in medical bills from the date of the accident to the time of trial of $106,200.11. The former husband also received periodic benefit payments from both the worker's compensation and disability carriers totalling $311,285 during that same period. He was also having his medical bills paid, and his car and boat payments were being satisfied by various disability carriers. At the same time, he was running up some $48,000 in credit card debt. Notwithstanding this evidence, the former husband testified he was no longer receiving either of these payments, and that those already received had been spent.
Because the former husband sought to share in any enhancement in the value of the wife's various businesses as a marital asset, a highly contested issue in the proceedings was the evaluation of the wife's 25% interest in those businesses. Several expert opinions were offered on the subject, ranging from a value of $3,000,000 to $300,000.
In its final judgment, the trial court found the $106,200 in medical payments made by the former husband's worker's compensation carrier directly to medical providers, as well as the $311,285 received by him in disability payments, qualify as marital assets "because they represented lost wages, lost current earning capacity dollars or reimbursement for current medical expenses." The court further found the enhanced value of the former wife's stock in her businesses was not a marital asset subject to equitable distribution because the former husband specifically agreed in the premarital agreement that he would not have any right to that value. In other words, the court ruled all the value of the former wife's stock, including any enhancement, was controlled by the agreement, under which the former husband waived any right he might otherwise have had to that stock. Notwithstanding, the court discussed the competing opinions provided at trial regarding the value of the former wife's corporations, rejected the valuations presented by the former husband's experts as "unreliable and unrealistic," and specifically accepted the opinion of the former wife's expert, John Matteis, that the corporations were worth $1,200,000, and that the former wife's 25% interest was $315,000.
In addition, the court noted the parties were holding in trust $62,600, known as the Mizner Money Market Account, and found these funds to be marital assets. Also, the parties had a Prudential Bache account with a total value of $135,293.31. Of this sum, $113,000 represented the proceeds of an inheritance to the former wife which was put directly into the account and never touched. Accordingly, the court awarded the former wife a special equity of $113,000 in the account, leaving $22,293.31 as a marital asset.
Based on these findings, the trial court distributed the marital assets and liabilities as follows. The former husband received, among other things: (1) $78,000, representing the proceeds from the corporate settlement; (2) $311,285 in disability payments; (3) $106,200 in direct medical payments; (4) his 27 foot boat, with an equity of $55,000; (5) his jewelry, worth $10,000; (6) a brokerage account valued at $14,500; (7) three vehicles (one owned by the former husband; the other two by his adult children); and (8) $1,900,000 *739 representing the husband's business receivables.
The former wife was awarded the $400,000 condominium, as well as its furnishings (worth $25,000), her jewelry (worth $10,000), and a brokerage account equal in value to that awarded the husband ($14,500). In addition, the trial court listed as a marital asset in the former wife's column the $190,000 representing the enhanced value of her businesses.
After distributing the various marital liabilities, including $48,000 in credit card debts run up by the former husband to him, the court concluded the net value of the parties' distributions was: $2,436,059 for the former husband and $542,500 for the former wife. Then, the court declared:
Even if the Husband argues that the receivables from his corporations are phantom assets and that the $1,900,000.00 that he testified to (and which he used as the basis to have the insurance carriers pay his current income disability payments) should not be considered a true asset, it would still result in the Husband having net equity in assets in the amount of $667,485.00 as compared to the Wife's net equity of $542,500.00. With those two figures in mind, the Court therefore finds that the Wife should receive the total amount of the trust money known as the Mizner Money Market Account in the amount of $62,600.00 and all the monies contained in the Prudential Bache account which have a marital value of $22,293.31. The premarital sum of $113,000.00 should obviously also go directly to the Wife... .
With that distribution as is set forth above, the Wife's total equity from this marriage would be $627,393.00 verses [sic] the Husband's total of $667,485.00, if none of his business receivables in the amount of $1,900,000.00 are added in. The Court finds that this is an equitable distribution of the parties' assets and liabilities.
Finally, the court ruled the parties were to bear their own costs and attorney's fees because "each party received substantial cash assets." This appeal follows.
As his first point on appeal, the former husband contends the trial court erred in treating the $106,200 in medical payments made directly to health care providers, and the $311,285 in disability and worker's compensation benefits made directly to him, as marital assets subject to distribution.
In Weisfeld v. Weisfeld, 545 So.2d 1341 (Fla. 1989), the Florida Supreme Court adopted an analytical approach to the question of when disability benefits can be treated as marital assets subject to equitable distribution. Those benefits paid to the spouse for noneconomic damages such as pain and suffering, as well as payment for loss of future wages and future medical expenses, are separate property of the spouse. Any compensation paid, however, to a spouse for "lost wages or lost earning capacity during the marriage of the parties and medical expenses paid out of marital funds during the marriage" constitute marital property. Id. at 1345-46. Here, the trial court concluded both the disability benefits and the medical payments fall into the latter category. We find error in this conclusion as to the medical payments because they were made directly to the health care providers. Hence, they were not paid out of marital funds as required by Weisfeld.
Next, the former husband claims error in the trial court's distribution to the wife of the parties' marital home and its contents. It is the former husband's position that the trial court failed to abide by either the premarital agreement or the addendum to that agreement.
Significantly, the trial court failed to provide any reasons in its final judgment as to why it was distributing the marital home and its contents to the former wife. With regard to the premarital agreement, paragraph 6 provides that "anything purchased by both parties or assets accumulated from this date forward shall be divided equally by both parties." We interpret this provision broadly to mean the assets acquired during the marriage generally, and not each particular asset, are to be divided equally. In light of the fact that the trial court's equitable distribution resulted in the former husband receiving $667,485 (exclusive of the $1,900,000 *740 in receivables), and the former wife receiving $627,393, which included the marital home and its contents, the terms of the premarital agreement were not violated. Cf. Bertone v. Bertone, 562 So.2d 363 (Fla. 2d DCA), rev. dismissed, 569 So.2d 1278 (Fla. 1990).
However, the addendum to that agreement expressly provided that, in the event neither party chose to exercise an option to purchase the home, upon divorce the home was to be sold and the "equity from such sale shall be divided equally between the parties." The addendum further provided the contents of the home were to be divided equally unless included in an appraisal or owned by either party prior to marriage. The trial court took testimony from the former wife showing the addendum was procured through fraud or trickery. In fact, the former husband did not attach it to his pleadings in which he sought exclusive possession of the condominium. For this reason, we conclude the trial court properly rejected the addendum and based its ruling on the broad language contained in the premarital agreement.
We would also like to point out that the trial court neglected to include the former wife's $26,554 IRA in its distribution scheme. The wife suggests the error is harmless because the court failed to consider a life insurance policy held by the former husband with a cash value of $31,000. Yet, no record cite or other authority is given for this assertion, and our review of the record has disclosed no such policy. Therefore, we reverse the trial court's equitable distribution. If, on remand, the former wife presents sufficient proof to support a finding that the former husband holds such an insurance policy, the court is directed to consider it in its redistribution.
As to the remaining issues, we find no merit in any of the former husband's contentions. In particular, we believe the trial court properly concluded that, based on the prenuptial agreement, the former husband waived the right to share in any enhancement in value of the wife's interest in her businesses. See Cameron v. Cameron, 591 So.2d 275 (Fla. 5th DCA 1991); See also Timble v. Timble, 616 So.2d 1188 (Fla. 4th DCA 1993). It follows, however, that the trial court erred in assigning the $190,000 in enhanced value to the former wife as part of her equitable distribution. The fact that the former husband waived his right to this asset meant it was not to be considered in the distribution of assets; it did not mean the enhanced value was to be awarded to the wife as part of her distribution. In other words, the trial court essentially awarded the former wife an asset to which she was otherwise entitled outside the equitable distribution scheme.
Having found that the former husband waived his right to share in the enhancement necessarily renders his claim that the trial court abused its discretion by limiting discovery of the corporate financial information, and relying on Matteis' valuations based on that information, moot. In addition, we find no error in the trial court designating the $1,900,000 in the former husband's corporate accounts receivable as a marital asset that was subsequently "awarded" to him. See Staman v. Staman, 622 So.2d 1147 (Fla. 1st DCA 1993). Finally, we conclude the trial court did not abuse its discretion in refusing to award the former husband at least a portion of his costs and attorney's fees upon a finding that he had sufficient current income and assets from which to pay his own fees. Although he testified his disability payments had been spent and that he was no longer receiving regular checks, this testimony was contradicted by that of at least four insurance company representatives who testified he was receiving regular disability or worker's compensation payments at the time of trial. Furthermore, as part of his equitable distribution, the former husband received a brokerage account valued at $14,500. For these same reasons, we deny the former husband's motion for appellate costs and attorney's fees.
In summary, then, the parties' equitable distributions should be made as follows. First, the trial court calculated the former husband's net equity as $667,485 (excluding the $1,900,000 in receivables). The parties conceded at oral argument that this was error. Since the former husband's gross equity totalled $2,436,059, the proper figure *741 should have been $536,059. From this amount, the $106,200 in medical payments is to be deducted, producing a total net equitable distribution to the former husband of $429,859. If, on remand, sufficient proof of the former husband's $31,000 life insurance policy is produced, that total would then be $460,859. For the former wife, the parties conceded at oral argument that the trial court improperly subtracted her share of the marital liabilities; the trial court only subtracted $1,000 for credit card debt when it should have subtracted $3,000. That leaves the former wife with an initial net equity of $539,500. Adding on the $62,600 Mizner Account and $22,293.31 in the Prudential Bache account results in a total of $624,393.31. Reducing that figure by the $190,000 enhancement value produces $434,393.31. Adding on her $26,554 IRA produces a total net equitable distribution to the former wife of $460,947.31.
GLICKSTEIN and POLEN, JJ., concur.

ON MOTION FOR REHEARING
We grant the former wife's motion for rehearing to the extent that we strike that portion of our prior opinion allowing the former wife an opportunity to introduce on remand evidence of the existence of a $31,000 life insurance policy held by the former husband. Upon further review of the record, we are satisfied the trial court's failure to include the former wife's $26,554 IRA in its distribution was harmless in light of the existence of this policy. Neither of these assets needs to be added to the respective parties' equitable distribution.
GLICKSTEIN and POLEN, JJ., and DONNER, AMY STEELE, Associate Judge, concur.